**ST. BERNARD GENERAL HOSPITAL, INC., Plaintiff-Appellant,**

v.

**HOSPITAL SERVICE ASSOCIATION OF NEW ORLEANS, INC., et al., Defendants-Appellees.**

No. 74–2186.

United States Court of Appeals, Fifth Circuit.

April 7, 1975.

Gibson Tucker, Jr., Jerald N. Andry, Charles A. O'Niell, Jr., New Orleans, La., for plaintiff-appellant.

Charles W. Lane, III, Harry S. Hardin, III, New Orleans, La., for defendants-appellees.

Before BELL, THORNBERRY and GEE, Circuit Judges.

THORNBERRY, Circuit Judge:

This is an appeal from a judgment dismissing an antitrust complaint for want of federal jurisdiction. We reverse and remand.

The facts necessary to our decision were well stated by the district court in an unpublished opinion, from which we generously borrow for purposes of our statement of the case. The plaintiff, St. Bernard General Hospital, Inc., ("St. Bernard"), instituted this suit as a class action to recover treble damages for al-

leged violations of § 1 of the Sherman Act, 15 U.S.C. § 1. The defendant, Hospital Service Association of New Orleans, Inc., ("Hospital Service"), is a non-profit mutual insurance association established to provide payment in favor of subscribers for the expense of complete hospital care. Hospital Service obtained a license to use the trade name "Blue Cross" in order to sell hospitalization insurance under the Blue Cross plan in the parishes of Orleans, Jefferson, St. Charles, Plaquemine, and St. Bernard. The licensor, American Hospital Association, was originally named a defendant but was later dismissed. No appeal was taken from the order dismissing American Hospital Association.

Very basically, the Blue Cross plan involves group prepayment of hospital charges to Hospital Service with a reciprocal agreement by member hospitals to render medical services to subscribing insureds. The member hospitals are compensated by Hospital Service for the medical assistance they provide to subscribers. The universe of eligible subscribers includes not only residents of the five local parishes, but also any Blue Cross insured who holds a policy issued by another licensee of American Hospital Association. Thus, it can and does occur that a New York resident may receive treatment in a New Orleans member hospital pursuant to a Blue Cross policy issued by a New York licensee. Conversely, a New Orleans subscriber with Hospital Service is eligible for insured treatment in a New York member hospital. These non-resident claims and charges are settled through a clearing house process which is utilized by the various plans across the country on a monthly collection basis. If a subscriber is treated at a non-member hospital, Hospital Service will make the reimbursement specified by the subscriber's policy to the insured or to the non-member hospital, if the insured has executed an assignment. The subscriber's coverage, however, is less comprehensive when a non-member hospital performs treatment.

Hospital Service originally consisted of the Touro Infirmary, the Southern Baptist Hospital, the Mercy Hospital, and the Hotel Dieu. In the health insurance trade these are known as "participating" hospitals, and they are so termed in their contracts with Hospital Service. Today there are other "participating" hospitals in the greater New Orleans area: the Ear, Eye, Nose and Throat Hospital, the Flint-Goodridge Hospital, the Oschner Foundation, the Sara Mayo Hospital, and the West Jefferson Hospital. In order to acquire "participating" status a hospital must meet several requisites: it must be accredited, it must be operated on a non-profit basis,[1] and it must enter into a particular kind of contract with Hospital Service. The contract requires the hospital to render medical services to subscribing insureds and entitles it to compensation from Hospital Service for the necessary and proper charges billed to the insured. In return, the "participating" hospital agrees to bear a portion of the expense of underwriting Hospital Service if the association becomes insolvent or its reserves become inadequate. The "participating" hospitals do not exist entirely at the mercy of events, however, for each is afforded two seats on Hospital Service's Board of Managers, and each is entitled to vote for remaining managers who are elected at large.

Hospitals like the plaintiff and its fellow class members, which operate for profit, may also become members of Hospital Service. They do so by signing a contract under which they are known as "contracting" hospitals. Presently there are ten such "contracting" hospitals, including St. Bernard, in the New Orleans area. These members have no voting rights in the election of Hospital

1. In its submission to the district court and in its brief to this court plaintiff, St. Bernard, contended that at least one of these "participating" hospitals, the Oschner Foundation, in fact earns a profit from its services. Because of the nature of the district court's ruling, discussed *infra*, no finding or opinion was expressed with respect to this contention. Consequently, we express none.

Service's management. On the other hand, they have no obligation to underwrite the association in case of insolvency or depleted reserves.

This lawsuit revolves around the contractual provisions between the for-profit hospitals and Hospital Service as those provisions detail the manner in which a "contracting" hospital is compensated for Blue Cross-insured treatment. The contracts provide that Hospital Service will reimburse 100% of the charges billed to the subscriber. Such reimbursement, however, may not exceed the average per diem payment or the average per case payment made to "participating"—i.e., non-profit—hospitals. Thus, the parties stipulate that for-profit hospitals like the plaintiff have been and will be required in various years to rebate to Hospital Service amounts collected from the association in excess of the average wholesale cost of services rendered at non-profit hospitals.

In its complaint, plaintiff alleged that these required rebates are fixed arbitrarily by the defendant and the "participating" members; that this so-called "premium to do business" with the defendant constitutes the product of an unlawful agreement in restraint of interstate commerce; and that the contractual scheme has injured plaintiff and its fellow for-profit hospitals by forcing them either to forfeit all profit on Blue Cross business and at times incur losses, or else pass the amount of the rebate on to the insured patient, which presumably would encourage Blue Cross subscribers to utilize only the "participating" non-profit hospitals. In its brief, plaintiff alleges more specifically a group boycott by the defendant and "participating" hospitals, which plaintiff asserts is a per se violation of Sherman Act, § 1.

The merits of the dispute were not reached below; indeed no answer was ever filed. Instead, defendant Hospital Service tendered a motion to dismiss for lack of jurisdiction or alternatively for failure to state a claim. Upon the submission of affidavits and depositions in the nature of summary judgment proof, the district court considered only the jurisdictional question. The plaintiff argued that jurisdiction should be sustained, either because for-profit hospitals render occasional services to out-of-state residents, or because hospitals must purchase drugs, equipment, and supplies from out-of-state sources in order to deliver health care at the local level. Although the complaint did not allege specific quantities or dollars-and-cents representing interstate purchases by plaintiff or any member of its class, the defendant did not attack the sufficiency of the pleadings. Rather, the defendant and the district court both took the position that whether plaintiff treated out-of-state patients or purchased products in interstate commerce was essentially immaterial to the question of Sherman Act jurisdiction.

Accordingly, relying on Page v. Work, 9th Cir. 1961, 290 F.2d 323,[2] several recent district court cases,[3] and a few earlier cases from other Circuits,[4] the court ruled that its inquiry was confined to one of characterizing the precise activity upon which the alleged restraint most directly impacted. Having determined that activity to be the rendition of hospital services, the court required that the activity itself either constitute an enterprise in interstate commerce, or, if predominately intrastate, that it "substantially affect" interstate commerce. The district court then held as a matter of law "that the rendition of hospital

**2.** "The test of jurisdiction is not that the act complained of affect a business engaged in *interstate commerce but that the conduct* complained of affects the interstate commerce of such business." 290 F.2d at 330.

**3.** Nankin Hospital v. Michigan Hospital Service, E.D.Mich.1973, 361 F.Supp. 1199; Doctors, Inc. v. Blue Cross of Greater Philadelphia, E.D.Pa.1973, 360 F.Supp. 693; Hospital

Building Co. v. Trustees of Rex Hospital, E.D. N.C.1973, 1973 Trade Cas. ¶ 74,428.

**4.** Elizabeth Hospital, Inc. v. Richardson, 8th Cir. 1959, 269 F.2d 167, cert. denied, 361 U.S. 884, 80 S.Ct. 155, 4 L.Ed.2d 120; Riggall v. Washington County Medical Society, 8th Cir. 1957, 249 F.2d 266, cert. denied, 355 U.S. 954, 78 S.Ct. 540, 2 L.Ed.2d 530 (1958); Spears Free Clinic and Hospital for Poor Children v. Cleere, 10th Cir. 1952, 197 F.2d 125.

services is a purely local activity." Therefore, it concluded, "the practice of the defendant is allegedly restraining a local activity of the plaintiff not in interstate commerce, and the Sherman Act is inapplicable, unless the plaintiff can demonstrate that the alleged restraint of the local function 'substantially affects interstate commerce.'"

Applying this latter part of its holding, but without giving any weight to plaintiff's jurisdictional arguments, the district court rejected plaintiff's contention with respect to treating out-of-state patients on the assumption that the likelihood that such a patient would seek treatment at a particular hospital is too incidental or "remote." As for the argument based on drugs and supplies purchased in interstate commerce, the court stated that "[w]hat is essentially an intrastate activity is not transformed into interstate commerce by reason of such purchases, and there exists no substantial effect on interstate commerce by the indirect effect of reducing prospective purchases of supplies in interstate commerce."

In the context of this class action involving allegedly predatory agreements imposed by Hospital Service upon ten for-profit hospitals, we reject the district court's scheme of analysis. Specifically, we disagree with the court's purely-local-as-a-matter-of-law premise from which all conclusions, as well as the putative absence of a "substantial effect" on interstate commerce followed. On the other hand, we are not entirely convinced that the plaintiff has made a sufficient showing to sustain Sherman Act jurisdiction. For example, plaintiff asserted neither in its complaint nor in its submissions below that defendant's conduct has caused or will cause any member of the complaining class to cease treating patients from other states or to curtail purchases of supplies from interstate sources. As matters currently stand, plaintiff essentially contends that certain contract provisions simply prevent New Orleans area for-profit hospitals from earning a profit on Blue Cross business. Hence, we reverse the judgment below solely on the basis of its unbending legal position. On remand, all issues—including the sufficiency of the complaint for purposes of Sherman Act jurisdiction—will be open for full consideration in light of whatever amendments the parties may offer, the evidence as it develops, and the factors we mention in the following discussion.

At the outset, we note that this court has already rejected the narrow reading of Page v. Work, *supra,* which permeates the district court's decision. In Lehrman v. Gulf Oil Corp., 5th Cir. 1972, 464 F.2d 26, 36, cert. denied, 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665, we stated:

> We do not accept the suggestion that Page v. Work holds, as a matter of law, that a conspiracy to restrain trade in an intrastate product cannot, as a matter of law, affect trade in another, interstate product sufficiently to trigger Sherman Act jurisdiction. The focus of the Act is to protect interstate trade from interferences of all degrees of subtlety. The concept of interstate commerce is a practical one. The interstate nerves of a local business can be deadened swiftly by a conspiracy the object of which happens to be the intrastate aspect of a plaintiff's business. We see no reason why the federal courts should confine themselves to protecting against interferences with interstate commerce which, quite fortuitously, turn out to have motivated the actions of a defendant. It is the effect on commerce that determines federal jurisdiction under the Sherman Act and not any notion of the "interstate culpability" of those who engage in anticompetitive practices. No matter how intrastate the objects of anticompetitive conspirators, they must take their victims' involvement in interstate commerce as they find them.

Significantly, *Lehrman,* like this case, involved allegedly illegal practices perpetrated most visibly at the local level. Nevertheless, numerous businesses were victimized in that, *inter alia,* the defend-

ant's conduct reduced their ability to purchase and sell goods from interstate commerce. This factor in itself was held to constitute one alternative basis of Sherman Act jurisdiction. Concerning the defendant's argument that, assuming some effect on interstate commerce the effect was jurisdictionally insufficient because purchased items often "came to rest" intrastate before resale, we noted that the requisite effect is nonethelsss accomplished by "a reduced or altered flow of goods into the State . . . from without the state." Thus, "Lehrman's business did have an impact on interstate commerce that was not 'insignificant or insubstantial.'" *Id.* at 35. *See also* Copper Liquor, Inc. v. Adolph Coors Co., 5th Cir. 1975, 506 F.2d 934, at 949. In other words, it was not *de minimis.*

Subsequent to *Lehrman,* we have had occasion to consider and reaffirm its broad jurisdictional implications for Sherman Act cases. In Battle v. Liberty National Life Ins. Co., 5th Cir. 1974, 493 F.2d 39, a class action was brought by a group of Alabama funeral homes contesting allegedly illegal burial policy arrangements whereby "authorized" funeral homes—i. e., those that entered into service contracts with the defendants— were reimbursed for a greater range of services to insureds than were the non-contracting, or "unauthorized," homes. Although we observed that the case was not adequately developed to permit a conclusive determination of jurisdiction, we recognized that certain of plaintiffs' allegations, if substantiated, would establish Sherman Act jurisdiction under *either* the "in commerce" or "substantial effect" tests. Among these allegations were: that the plaintiffs used caskets purchased out-of-state in performing services under the burial policies; that they purchased clothing, embalming fluids, and other funeral necessities from out-of-state sources; and that they performed funeral services under the policies for residents of other states who died in Alabama. We stated that "[i]f

these facts are established, it appears that such activities, when considered *in the aggregate,* would have a substantial impact on interstate commerce [i. e., not "insignificant or insubstantial"], and thus satisfy the jurisdictional requirement under the Sherman Act." 493 F.2d at 48 (emphasis ours).

Besides citing *Lehrman,* the *Battle* court cited Doctors, Inc. v. Blue Cross of Greater Philadelphia, 3rd Cir. 1973, 490 F.2d 48, reversing D.C., 360 F.Supp. 693. In the case *sub judice* the district court relied heavily on the lower court decision in *Doctors, Inc.* The Third Circuit's reversal apparently was not brought to its attention. In any event, we consider the Third Circuit's opinion well-reasoned, its distinctions of the authorities relied on by the court below soundly-drawn, and its rationale consistent with our decisions in *Lehrman* and *Battle.* Furthermore, *Doctors, Inc.* is in substance indistinguishable from the instant case with the one exception that our plaintiff's pleading is less specific in terms of allegations necessary to establish the interstate connections required for Sherman Act jurisdiction. *Compare* 490 F.2d at 50 nn. 3, 3a. Nevertheless, we emphasize that this case has proceeded as if the sole question were purely legal; no challenge to the sufficiency of the jurisdictional pleadings or the jurisdictional proof has been entered. Therefore, we do not believe that this one distinction should alter our conclusions.

In summary, we have not held that plaintiff St. Bernard has sustained Sherman Act jurisdiction, either for itself or for the class it seeks to represent. We have only held that, on remand, a proper view of the posture of this case in light of controlling precedent entitles the plaintiff to establish its right to a day in federal court. We do not consider our disposition to be in conflict with the very recent *en banc* opinion by the Fourth Circuit in Hospital Building Co. v. Trustees of the Rex Hospital, 4th Cir. 1975, No. 73–1627, 511 F.2d 678.[5] There, with

---

5. Nor is United States v. Oregon State Medical Society, 343 U.S. 326, 72 S.Ct. 690, 96

L.Ed. 978 (1952), to the contrary. There, in a Sherman Act injunction suit brought by the

three judges dissenting, the Fourth Circuit affirmed the dismissal of a single small hospital's Sherman Act complaint for lack of jurisdiction.[6] We believe the court's distinction of *Doctors, Inc.* likewise fully distinguishes the circumstances of this case. As the Fourth Circuit majority put it:

> There is simply no significant comparison between the effect on commerce of one small hospital's delayed expansion [which was the sole injury alleged by the plaintiff], especially when other hospitals contemplate expansion, and the vastly greater effect of the possible closing of a significant percentage of the hospitals in a metropolitan area.

In this case, of course, fully ten of the nineteen New Orleans area Blue Cross member hospitals comprise the plaintiff class. Also, we note that the Fourth Circuit announced its decision not without considerable trepidation, terming it "a rare exception to prove the rule that judgments on the pleadings in antitrust cases will ordinarily be reversed." In view of this cautionary reminder, we are not disturbed that the logic of *Hospital Building Co.* argues for a result contrary to that which we have reached. Instead, we believe that our decision accords with the proposition to which we, as well as the Fourth Circuit, are firmly committed:

> There is no bright line dividing cases in which the effect upon interstate commerce is sufficient to permit Congress to prohibit particular anticompetitive activity under the commerce clause from those cases in which it is not sufficient. In this area perhaps more than in most, each case must turn on its own facts.

*Rasmussen v. American Dairy Association*, 9th Cir. 1973, 472 F.2d 517, 526, cert. denied, 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003; *Hospital Building Co., supra.*

Reversed and remanded.

---

government, the district court had found as fact that "[t]he sale of medical services, by Doctor Sponsored Organizations, as conducted within the State of Oregon, is not trade or commerce within the meaning of Section 1 of the Sherman Anti-Trust Law . . . ." 343 U.S. at 338, 72 S.Ct. at 698, 96 L.Ed. at 987. The Supreme Court upheld this finding as not clearly erroneous, stating, "[t]he appeal brings to us no important questions of law or unsettled problems of statutory construction. . . . Its issues are solely ones of fact." 343 U.S. at 330, 72 S.Ct. at 694, 96 L.Ed. at 983. In this case, by contrast, no testimony has yet been presented and no facts have been found.

**6.** See note 3, *supra.*